**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **F5 CAPITAL,** | |
| **Plaintiff,** | **CIVIL ACTION NO.** |
| | **3:14-cv-01469-VLB** |
| **v.** | |
| **RBS SECURITIES INC. and THE DEPOSITORY TRUST COMPANY,** | **January 16, 2015** |
| **Defendants.** | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT RBS SECURITIES INC.'S MOTION TO DISMISS UNDER**
**THE DOCTRINE OF *FORUM NON CONVENIENS***

Robert S. Hoff (ct27084)
Wiggin and Dana LLP
Two Stamford Plaza
281 Tresser Boulevard
Stamford, CT 06901
Tel: (203) 363-7600
Fax: (203) 363-7676
rhoff@wiggin.com

Timothy A. Diemand (ct18075)
Wiggin and Dana LLP
20 Church Street
Hartford, CT 06103
Telephone: (860) 297-3700
Facsimile: (860) 525-9380
tdiemand@wiggin.com

## *PRELIMINARY STATEMENT*

This action by Plaintiff F5 Capital ("F5") arises out of and relates to a settlement agreement (the "Settlement Agreement") between F5 and the Royal Bank of Scotland plc ("RBS"), which is the parent of Defendant RBS Securities Inc. ("RBSSI").  Although F5 has styled its claims as conversion, civil theft, replevin, an accounting and negligence against RBSSI, this case amounts to nothing more than a claim for breach of the Settlement Agreement by RBS. Because the Settlement Agreement contains an exclusive jurisdiction clause requiring that any disputes be brought in an English Court, this Court has no jurisdiction and the case must be dismissed.

In 2012, F5 and RBS reached a settlement regarding litigation F5 and its affiliates brought in the English courts against RBS.  The Settlement Agreement provides:

> The Parties agree that the courts of England have exclusive jurisdiction to hear and decide any action or proceedings, and/or to settle any disputes, which may arise out of or in any way relate to this Agreement or its formation and, for these purposes, each party irrevocably submits to the jurisdiction of the courts of England.

Declaration of Craig Berry ("Berry Decl."), Exhibit A, § 13.2.

The Settlement Agreement further provides that "any dispute, controversy, proceedings or claim of whatever nature arising out of or in any way relating to this Agreement or its formation (including any non-contractual disputes or claims) shall be governed by and construed in accordance with English law."  *Id.*, Ex. A, § 13.1.

This action unquestionably arises out of and relates to the Settlement Agreement.  F5 seeks the return of shares in a company called Star Bulk Carriers

1

Corporation ("Star Bulk"), plus damages allegedly arising from RBS' failure to return the shares.  The only reason F5 is entitled to the return of those shares is that the Settlement Agreement required RBS to "take such steps as may be required to release and discharge" the shares upon receipt of a settlement payment from F5 and its affiliates.  Compl. ¶ 13.  F5 has no other basis on which to request return of the shares except for the Settlement Agreement's requirements.  Because the Settlement Agreement required RBS to take steps to return the shares, and F5 claims RBS has not done so, F5's claims undoubtedly arise out of and relate to the Settlement Agreement, and are governed by its exclusive jurisdiction clause requiring that suit be brought in England.  RBSSI – which is not even a proper party here – therefore moves that this case be dismissed under the doctrine of *forum non conveniens*.

STATEMENT OF FACTS

A.    *F5's Transfer of the Star Bulk Shares to RBS as Collateral, and the Subsequent Transfer to RBSSI*

F5, a Cayman Island company owned by Hsin Chi Su, alleges that it acquired 3,000,000 shares in Star Bulk in 2008.[1]  Compl. ¶¶ 2, 8.  Mr. Su also owns

---

[1] As this is a motion to dismiss based on the doctrine of *forum non conveniens*, the facts are drawn from the pleadings, affidavits, and documents attached to affidavits.  *See Martinez v. Bloomberg LP*, 740 F.3d 211, 216 (2d Cir. 2014) ("In deciding a motion to dismiss for *forum non conveniens*, a district court normally relies solely on the pleadings and affidavits.") (citation omitted).  In addition, because the Complaint refers to the Settlement Agreement (Compl. ¶¶ 22-23), it is

(*Cont'd on next page*)

2

TMT Co. Ltd. ("TMT").  *Id.* ¶ 2.  TMT had a "Forward Freight Agreement Clearing Account" with RBS.  *Id.* ¶ 9.  After RBS made a margin call against TMT's account, TMT sent RBS a share certificate for the Star Bulk shares as collateral.  *Id.* ¶ 10.  F5 allegedly owns the shares.  *Id.*

After RBS received the Star Bulk share certificate as collateral, it sent the share certificate to ABN AMRO in February 2009.  *Id.* ¶ 11.  RBSSI subsequently received the share certificate after it acquired certain businesses from ABN AMRO.  RBSSI arranged to have the shares converted to electronic form such that The Depository Trust Company ("DTC"), a central securities depository, became the registered holder of the shares.  *Id.* ¶ 12.  The DTC  placed the shares in an account that RBSSI maintained with the DTC.  *Id.* ¶ 12.  RBSSI never exercised ownership rights over the shares.  As alleged in the Complaint, "RBS through its subsidiary Defendant RBSSI still exercises possessory ownership rights over F5's Star Bulk shares."  *Id.* ¶ 27.  F5 does not allege anything other

---

appropriate for the Court to consider the Agreement on a motion to dismiss. Courts in the Second Circuit routinely consider contracts containing forum selection clauses when deciding *forum non conveniens* motions.  *See, e.g.*, *Longo v. FlightSafety Intern., Inc.*, 1 F.Supp. 3d 63, 65 (S.D.N.Y. 2014) (considering contract containing forum selection clause referenced in complaint and attached to affidavit submitted with motion to dismiss pursuant to the doctrine of *forum non conveniens*); *Allianz Global Corporate & Specialty v. Chiswick Bridge*, No. 13-cv-7559, 2014 WL 6469027, at *1 (S.D.N.Y. Nov. 17, 2014) (same).

than that RBSSI maintained the shares in an account solely for the beneficial interest of RBS.

**B.    The UK Litigation and Resulting Settlement Agreement Designating England as the Forum to Resolve All Disputes Relating to the Settlement**

F5 and several companies affiliated with it – all of which were owned by Mr. Su – sued RBS in 2010 (the "UK Lawsuit").  Compl. ¶ 13.  F5 and its affiliates chose to file suit in England, in the Commercial Court of the High Court, Queen's Bench Division.  Berry Decl., Ex. A, p. 1.  The UK Lawsuit concerned (among other things) securities held by RBS, including the Star Bulk shares.  Compl. ¶ 13. In 2012, the parties to the UK Lawsuit reached a settlement.  *Id.*

Under the terms of the Settlement Agreement, F5 and its affiliates agreed to pay RBS a sum of money.  Berry Decl., Ex. A, ¶ 1.1.  In return, RBS agreed to "take such steps as may be required to release and discharge, to [F5 Capital and its affiliates] as appropriate, the security held by [RBS] as set out in Schedule 3." *Id.*, Ex. A, ¶ 1.7(b).  Included in Schedule 3 were "[t]he 3 million ordinary shares in Star Bulk Carriers Corporation deposited with [RBS] by [F5 Capital]."  *Id.*, Ex. A, p. 11 (Schedule 3), ¶ 2.

The Settlement Agreement is clear that it governs all disputes arising out of or relating to it; that such disputes are to be governed by the laws of England; and that English courts have "exclusive jurisdiction" over such disputes.  Under the Settlement Agreement's forum selection clause, F5 agreed that

> the courts of England have *exclusive jurisdiction* to hear and decide any action or proceedings, and/or to settle any disputes, which may *arise out of or in any way relate* to this Agreement or its formation and, for these purposes, each party irrevocably submits to the jurisdiction of the courts of England.

*Id.*, Ex. A ¶ 13.2 (emphasis added).

This forum selection clause is broadly worded.  It governs all disputes "aris[ing] out of" or "in any way relat[ing]" to the Settlement Agreement.  *Id.*  Any such dispute is to be brought "exclusive[ly]" in the English legal system.  F5 "irrevocably submit[ed]" to the jurisdiction of the English courts to resolve such disputes.  *Id.*

The Settlement Agreement also contains a choice-of-law clause.  It provides:  "This Agreement and any dispute, controversy, proceedings or claim of whatever nature arising out of or in any way relating to this Agreement or its formation (including any non-contractual disputes or claims), shall be governed by and construed in accordance with English law."  *Id.*, Ex. A ¶ 13.1.

Thus, all claims brought by F5 which "in any way relat[e]" to or "aris[e] out of" the settlement agreement are governed by English law.  This is true regardless of the "nature" of the claim: both contractual and "non-contractual disputes or claims" (such as tort claims) are governed by English law.

C.  *The Instant Complaint, Which "arises out of" and "relates to" the Settlement Agreement*

On October 3, 2014, F5 filed the instant Complaint.  Although F5 claims that the "Settlement Agreement no longer serves any purpose and no claim is asserted thereunder," Compl. ¶ 23, it is clear based on the four corners of the Complaint that all of its claims stem from an alleged breach of the Settlement Agreement by RBS.

The basis for F5's claim that it is entitled to return of the Star Bulk shares is the Settlement Agreement.  F5 alleges that it has had an "unencumbered legal

right to the shares since at least May 2012," when the Settlement Agreement was signed.  *Id.* ¶ 22.  Specifically, F5 claims that "RBS agreed, in return for consideration, to 'take such steps as may be required to release and discharge . . . [t]he 3 million ordinary shares in Star Bulk Carriers Corporation deposited with [RBS] by [F5 Capital].'"  *Id.* ¶ 13.  F5 now claims that RBS has failed to release and discharge those shares – the very action the Settlement Agreement allegedly required.  There could not be a clearer case of an action that arises out of or relates to the Settlement Agreement.  Nevertheless, F5 has brought claims against RBSSI for conversion, civil theft and negligence, and demands replevin and an accounting, for RBSSI's alleged failure to release and discharge the Star Bulk shares.

Although RBSSI is named as a defendant, this dispute is clearly between F5 and RBS.  According to the Complaint "RBSSI asserts no present claim over the shares."  *Id.* ¶ 18.  Instead, RBS exercises possessory ownership over the shares: "RBS *through its subsidiary* Defendant RBSSI still exercises possessory ownership rights over" the shares.  *Id.* ¶ 27 (emphasis added).  F5 does not allege that RBSSI has, or has ever had, a beneficial interest in the Star Bulk shares.  The only entities (according to F5) that ever claimed a beneficial interest in the shares were it and RBS.[2]  After RBS received the Star Bulk share certificate, it sent the

_____

[2] F5 alleges that "more than half of the Star Bulk shares held by RBS or RBSSI never were subject to any pledge."  Compl. ¶ 23.  Regardless of whether they were ever subject to a pledge of collateral, all of the shares at issue derive from (***Cont'd on next page***)

certificate to ABN AMRO.  RBSSI subsequently received the certificate, converted the shares to electronic form, and deposited them with the DTC.[3]  *Id.* ¶¶ 10-12.  In other words, RBSSI merely played an intermediary role, receiving the shares from RBS and transferring them to DTC to be held ultimately for RBS' beneficial interest.

F5 has not alleged facts showing that RBSSI is a proper party to a dispute concerning the Star Bulk shares.  All of F5's substantive allegations in the instant litigation are asserted against RBS.  F5 alleges "RBS received its consideration [under the Settlement Agreement] and has asserted no right to hold the shares since then."  *Id.* ¶ 13.  Likewise, it asserts that it instructed RBS to purchase new Star Bulk shares.  *Id.* ¶ 16.  It also alleges that it asked RBS for assurances concerning accounting of the shares, *id.* ¶ 20, requested that RBS release the shares, *id.* ¶ 22, and claims that RBS improperly requested a broad release in return for transferring the shares, *id.*  Although F5 has also made allegations concerning RBSSI's conduct, these conclusory allegations boil down to the claim that RBSSI, a wholly-owned subsidiary of RBS playing an intermediary role, has

---

the original shares subject to the Settlement Agreement since they were acquired through a reverse stock split or were purchased with dividends from the original 3,000,000 shares.  Compl. ¶¶ 15-16.

[3] Although not specifically alleged in the Complaint, the fact is that RBSSI credited the Star Bulk shares to an account that RBS maintained with RBSSI.  That is, RBSSI always held the shares for the beneficial interest of RBS.

not released shares in which it has no beneficial interest.  The actual dispute in this case is between F5 and RBS, and is governed by the Settlement Agreement.

Since RBS is only required to return the Star Bulk shares because of the Settlement Agreement, this case arises out of and relates to the Settlement Agreement under any conceivable theory of liability, and is governed by its exclusive jurisdiction clause requiring suit in England.

### ARGUMENT

In *Atlantic Marine Construction Company v. United States District Court for the Western District of Texas*, 134 S. Ct. 568 (2013), the Supreme Court clarified that a party seeking to enforce a forum selection clause pointing to a foreign jurisdiction should do so through a motion to dismiss based on the doctrine of *forum non conveniens*.  *Id. at* 580.  *See also Martinez v. Bloomberg LP*, 740 F.3d 211, 216 (2d Cir. 2014) (noting that in *Atlantic Marine*, "[t]he Court held that generally 'the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*,' rather than Rule 12(b)(3)" (quoting *Atlantic Marine*, 134 S. Ct. at 580)).

A party seeking to overcome a forum selection clause bears a "heavy burden."  *Id.* at 219.  Indeed, there is a strong public policy in favor of enforcing forum selection clauses.  *Id.* at 218.  Such clauses reduce uncertainty about where a complaint must be brought, and therefore are an "'indispensable element in international commerce.'"  *Id.* (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 14 (1972)).  As a result, forum selection clauses are "prima facie valid," and should usually be enforced.  *TradeComet.com LLC v. Google, Inc.*, 647 F.3d

472, 475 (2d Cir. 2011).  *See also Martinez,* 740 F.3d at 219 ("*Atlantic Marine* . . .
plainly reaffirms *Bremen*'s identification of a strong federal public policy
supporting the enforcement of forum selection clauses.").  Courts give
"substantial deference" to forum selection clauses.  *Magi XXI, Inc. v. Stato della
Citta del Vaticano*, 714 F.3d 714, 721 (2d Cir. 2013).

      Where a contract contains both a choice-of-law and choice-of-forum
clause, courts in the Second Circuit apply a four-part test to determine whether a
complaint should be dismissed on *forum non conveniens* grounds.  *Martinez*, 740
F.3d at 217.  The forum selection clause is presumptively enforceable if (1) it "was
reasonably communicated" to plaintiff; (2) the clause is mandatory, rather than
permissive; and (3) the claims and the parties in this case are subject to the
clause.  *Id.*  If the first three elements are met, plaintiff can only overcome the
presumption of enforceability by "(4) 'making a sufficiently strong showing that
enforcement would be unreasonable or unjust, or that the clause was invalid for
such reasons as fraud or overreaching.'"  *Id.* (quoting *Phillips v. Audio Active
Ltd.*, 494 F.3d 378, 383-84 (2d Cir. 2007)).

      In addition to the forum selection clause pointing to English courts, the
Settlement Agreement that F5 signed in May 2012 has a choice of law clause
providing that English law governs.  Under *Martinez*, federal law governs the
enforceability of the forum selection.  *Id.* at 224.  "[I]nterpretive questions —
questions about the meaning and scope of a forum selection clause — are
resolved under the substantive law designated in an otherwise valid contractual
choice-of-law clause."  *Id.*  In other words, the law of the Second Circuit will

9

govern question (4) of the four-part test described above: whether F5 can overcome the valid forum selection clause.  *Id.* at 217-18.  English law will govern questions (2) and (3): whether the clause is mandatory, and whether the claims and parties in this case are subject to the clause.  *Id.*

A.     **The Forum Selection Clause, Part of a Negotiated Settlement, Was Reasonably Communicated to F5.**

As discussed above, the forum selection clause is an explicit part of the Settlement Agreement.  This Settlement Agreement is relatively short, consisting of approximately six pages.  *See* Berry Decl., Ex. A.  The forum selection clause appears in Article 13 (out of fourteen articles).  *Id.*, Ex. A, p. 4.  It was negotiated between F5 and RBS after two years of litigation.  Compl. ¶ 13.  Both parties were represented by counsel when they signed the Settlement Agreement.  Berry Decl., ¶ 5.  After negotiation and review, F5 signed the Settlement Agreement.  *Id.*, Ex. A, pp. 5-6.[4]

District Courts in Connecticut have not hesitated to find that similar forum selection clauses were "reasonably communicated."  For example, in *Brooks v. Batesville Casket Co.*, No. 3:11-731, 2011 WL 3837089 (D. Conn. Aug. 30, 2011), the court found that a forum selection clause was "reasonably communicated" where it "was presented in plain English in a relatively short . . . agreement signed by [the plaintiff]."  *Id.* at *3.  Likewise, in *Madsen v. RBS Citizens, N.A.*, No. 13- 00357, 2013 WL 2367836 (D. Conn. May 29, 2013), the court found that a forum

---

[4] **F5 signed a version of the Settlement Agreement marked as a "draft."  However, that is the final Settlement Agreement.  Berry Decl., ¶ 6.**

selection clause "made in an arms'-length negotiation by experienced and sophisticated parties" was reasonably communicated. *Id.* at \*4 (quoting *Bremen*, 407 U.S. at 12).  The forum selection clause in this case, part of a negotiated settlement between F5 and RBS, was "reasonably communicated" to F5.

**B.     The Forum Selection Clause is Mandatory, Rather than Permissive.**

A "forum selection clause is viewed as mandatory when it confers exclusive jurisdiction on the designated forum or incorporates obligatory venue language."  *Phillips*, 494 F.3d at 386.  Under a mandatory forum selection clause, the parties are required to bring a dispute in the designated forum.  *Id.* at 383.  Under a permissive forum selection clause, the parties are permitted to do so.  *Id.*

Here, the plain language of the forum selection clause shows it is mandatory.  It states that the courts of England have "exclusive jurisdiction."  Berry Decl., Ex. A. ¶ 13.2.  Further, to ensure that this mandatory forum selection clause is enforceable, F5 agreed to "irrevocably submit[] to the jurisdiction of the courts of England."  *Id.*

United States courts have found similar forum selection clauses to be mandatory.  *See Martinez v. Bloomberg LP*, 883 F. Supp. 2d 511, 516 (S.D.N.Y. 2012) (noting that clause that provided for "exclusive jurisdiction of the English courts" was mandatory) *aff'd*, 740 F.3d 211 (2d Cir. 2014); *Cfirstclass Corp. v. Silverjet PLC*, 560 F. Supp. 2d 324, 328 (S.D.N.Y. 2008) (holding forum selection clause was mandatory where it provided: "This Agreement wherever made or to be performed shall be governed and construed in accordance with English law and all disputes arising hereunder shall be submitted to the exclusive jurisdiction of the Courts of England and Wales.").

11

**C.**    ***The Claims and Parties in this Case are Subject to the Forum Selection Clause.***

The forum selection clause here governs all claims "aris[ing] out of" or "relat[ing] to" the Settlement Agreement.  Berry Decl., Ex. A ¶ 13.2.  "Arising out of" "generally indicates a causal connection."  *Phillips*, 494 F.3d at 389.  "Relating to" is a broader term, and does not necessarily require a causal connection.  *MAK Mktg., Inc. v. Kalapos*, 620 F. Supp. 2d 295, 305 (D. Conn. 2009).  Here, F5's claims both arise out of and relate to the Settlement Agreement.

F5's Complaint boils down to a claim that F5 is entitled to return of the shares under the Settlement Agreement, RBS has not returned the shares in breach of the Agreement, and RBS' subsidiary RBSSI should therefore be ordered to turn them over.[5]  For whatever reason, rather than suing RBS for breach of the Settlement Agreement in England, where this case belongs, F5 has instead sued RBSSI for various common law claims in Connecticut.  However, all of those claims are based on RBS's alleged breach of the Settlement Agreement, and thus "arise out of" and "relate to" it.

F5 claims that some of the shares are not "subject to any pledge," Compl. ¶ 23, but F5 does not assert that the alleged requirement to return the shares is governed by anything other than the Settlement Agreement.  Moreover, all of the shares currently at issue derive from the shares covered by the Settlement Agreement.  *Id.* ¶¶ 14-16.  They were bought with dividends paid on shares

---

[5] **Although this fact may be beyond the scope of this motion, the Court should know that RBS has tendered the shares to F5.  Berry Decl. ¶ 8.**

unquestionably covered by the Settlement Agreement.  *Id.*  F5 cannot claim that RBSSI is required to transfer all the shares under the Settlement Agreement while simultaneously asserting that some of the shares are not subject to it.

Further, F5 cannot avoid the effect of the forum selection clause by pleading around a breach of contract claim.  "[A] forum selection clause should not be defeated by artful pleading of claims not based on the contract containing the clause if those claims grow out of the contractual relationship, or if 'the gist' of those claims is a breach of that relationship."  *MAK Mktg.*, 620 F. Supp. 2d at 305.  Despite F5's attempt at "artful pleading," the gist of its claims is that RBS has breached the Settlement Agreement.  Under the Settlement Agreement, F5 must bring its claims in England.

English law supports this interpretation of the Settlement Agreement.  As the Second Circuit has observed, English courts liberally construe forum selection clauses.  *Martinez*, 740 F.3d at 224 (citing *Fiona Trust & Holding Corp. v. Privalov*, [2007] EWCA (Civ) 20, [18]).  English courts presume that a forum selection clause covers all disputes relating to the contracting parties' relationship "'unless the language makes it clear that certain questions were intended to be excluded from the'" forum selection clause.  *Id.* at 224-225 (quoting *Fili Shipping v. Premium Nafta Prods. Ltd.*, [2007] UKHL 40, [13]).  Just as in the Second Circuit, under English law "[t]he scope of a forum selection clause does not turn on 'whether an ingenious pleader could frame a cause of action without actually mentioning the . . . Agreement.'" *Id.* at 227 (quoting *Skype Technologies SA v. Joltid Ltd.*, [2009] EWHC (Ch) 2783, [19]).  Rather, the forum

selection clause in the Settlement Agreement will cover all claims, including tort claims, arising from a breach of contract claim.  *Id.* (citing English case law and treatises).  Because F5's claims derive from its allegation that RBS has breached the Settlement Agreement, they fall within the scope of its forum selection clause.

It is irrelevant that RBSSI is not specifically named as a party to the Settlement Agreement.  RBSSI may enforce the forum selection clause against F5 as long as it is "closely related to another signatory" and it is "reasonably foreseeable" that RBSSI would seek to enforce the forum selection clause.  *Magi XXI*, 714 F.3d at 723 (internal quotation and citation omitted).  RBSSI has met this test.  First, RBSSI is a wholly-owned indirect subsidiary of RBS.  Compl. ¶ 3.  RBS, of course, is a signatory to the Settlement Agreement.  Further, RBSSI (or one of its predecessor entities) received the shares to hold for the beneficial interest of RBS before RBS signed the Settlement Agreement.  *Id.* ¶ 11.  Thus, since RBSSI is closely related to RBS, and F5 knows that RBSSI holds the shares in question for the beneficial interest of RBS, it was foreseeable that RBSSI would seek to enforce the forum selection clause.[6]

---

[6] It is also irrelevant that F5 has brought tort claims against RBSSI.  *See Magi XXI*, 714 F.3d at 724 ("A contractually-based forum selection clause also covers tort claims against non-signatories if the tort claims ultimately depend on the existence of a contractual relationship between the signatory parties.") (internal quotations and citations omitted).  As discussed extensively above, F5's claims depend on the existence of the Settlement Agreement between it and RBS.

14

In addition, courts in the Second Circuit have held that a forum selection clause can be enforced against the signatory when the signatory names an improper party in attempt to circumvent a forum selection clause.  *Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996) (enforcing arbitration clause when plaintiff had named non-parties to the arbitration agreement in "a bald attempt to evade its duty to arbitrate").  This is in keeping with the Second Circuit's general principal disallowing "parties to contracts from using evasive, formalistic means lacking economic substance to escape contractual obligations."  *Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 701 (2d Cir. 2009) (holding that a successor-in-interest to a signatory to a forum selection clause may be bound by that clause).  This case is a blatant attempt by F5 to circumvent the forum selection clause by suing RBSSI, a non-party to the Settlement Agreement who has never held any interest in the Star Bulk shares.  As discussed above, RBSSI held the shares as a securities intermediary for RBS.  Rather than sue RBS – the party against whom F5 actually alleges a grievance – F5 seeks to escape the Settlement Agreement it signed by suing RBSSI, who merely held the shares on RBS's behalf.

The conclusion that F5 has named the wrong party in an effort to avoid the forum selection clause is reinforced by the Uniform Commercial Code ("UCC"), which makes it clear that RBSSI cannot be held liable even if F5's allegations are true.  Under UCC 8-115,

> A securities intermediary that has transferred a financial asset
> pursuant to an effective entitlement order, or a broker or other agent
> or bailee that has dealt with a financial asset at the direction of its

> customer or principal, is not liable to a person having an adverse
> claim to the financial asset.

In other words, because RBSSI "acted at the direction of its customer" RBS with regards to the Star Bulk shares, it cannot be held "liable in conversion or any similar theory if it turns out that another person had an adverse claim to the property held by the customer."  7A Hawkland UCC Series § 8-115:01 [Rev].

Even though RBSSI cannot possibly be liable to F5, F5 has nevertheless named RBSSI in an attempt to escape the forum selection clause it agreed to with RBS.  Under these circumstances, this Court should enforce the forum selection clause.  *See, e.g.*, *Vertucci v. Orvis*, No. 05-1307, 2006 WL 1688078, at *5 (D. Conn. May 30, 2006) (recognizing that arbitration agreement should be enforced when plaintiff's naming of parties not subject to the agreement "had no plausible purpose other than to evade its duty to arbitrate its disputes") (internal quotation and citation omitted); *Midamines SPRL Ltd. v. KBC Bank NV*, No. 12-8089, 2014 WL 1116875, at *6 (S.D.N.Y. Mar. 18, 2014) ("Plaintiffs all but concede that Midamines Congo undertook the assignment precisely to avoid the forum-selection clause.  The Court declines to give effect to this purely evasive maneuver."); *Doctor's Associates, Inc. v. Hollingsworth*, 949 F. Supp. 77, 84 (D. Conn. 1996) (holding "the franchisees cannot evade their contractual obligation to arbitrate by omitting DAI as a party").

**D.    *Enforcing the Settlement Agreement Is Not "Unreasonable" or "Unjust."***

Because RBSSI has met the first three factors of the test for enforcing a forum selection clause, F5 may only overcome the presumption of enforceability by showing that it would be "unreasonable" or "unjust."  *Martinez*, 740 F.3d at

227.  To do so, F5 must show "(1) [the forum selection clause's] incorporation was the result of fraud or overreaching; (2) the law to be applied in the selected forum is fundamentally unfair; (3) enforcement contravenes a strong public policy of the forum in which suit is brought; or (4) trial in the selected forum will be so difficult and inconvenient that the plaintiff effectively will be deprived of his day in court."  *Id.* at 228.  F5 cannot make such a showing.

First, F5 admits in its Complaint that it negotiated for the Settlement Agreement.  Compl. ¶ 13.  Thus, the Agreement cannot be the result of "fraud or overreaching."

Second, F5 cannot credibly argue that English law is fundamentally unfair. Under the Settlement Agreement's choice of law clause, regardless of whether this suit is heard in this Court or in an English court, it will be governed by English law, a choice of law with which F5 agreed.  *See* Berry Decl., Ex. A ¶ 13.1. *See also Tropp v. Corp. of Lloyd's*, No. 07-414, 2008 WL 5758763, at *14 (S.D.N.Y. Mar. 26, 2008) ("It borders on the risible to argue that the English system, from which ours explicitly derives, does not afford due process.") (punctuation and citation omitted) *aff'd*, 385 F. App'x 36 (2d Cir. 2010).

Third, F5 also has no argument that enforcement of the forum selection clause contravenes public policy.  Courts in the Second Circuit have not hesitated to transfer claims to English courts.  *See e.g., Martinez*, 740 F.3d at 214 (affirming ruling that plaintiff's statutory, state law, and local claims fell under forum selection clause pointing to England); *Phillips*, 494 F.3d at 393 (enforcing forum selection clause pointing to England).

Fourth, F5 can make no showing that "proceeding in England would be so difficult and inconvenient that he would effectively be deprived of his day in court." *Martinez*, 740 F.3d at 230 (punctuation and citation omitted).  F5 previously chose to sue RBS in the English courts, and entered into a Settlement Agreement with an exclusive jurisdiction clause calling for future litigation to be brought in England.  F5 is more than capable of litigating in its chosen forum again.

**E.    *This Case Should Also be Dismissed under the Balancing Test for Forum Non Conveniens***

This Court also has the discretion to dismiss this case on *forum non conveniens* grounds if it finds that "considerations of convenience, fairness, and judicial economy so warrant."  *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 423 (2007).  The Second Circuit applies a three-step test to determine if dismissal is appropriate under this doctrine.  *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005).  Under step one, the Court considers "the degree of deference properly accorded the plaintiff's choice of forum."  Then, "it considers whether the alternative forum proposed by the defendants is adequate."  *Id.*   Lastly, it "balances the private and public interests implicated in the choice of forum."  *Id.*

Here, no deference should be awarded F5's choice of forum.[7]  F5 is a Cayman Islands company.  Less deference is awarded to a foreign plaintiff when it chooses to litigate in the United States.  *Id.* at 154.  Further, "the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons," the less deference F5 should receive.  *Id.* (punctuation and citation omitted). Here, F5's choice of forum must be motivated *solely* by forum shopping concerns.  F5 has no legitimate claim against RBSSI.  Its dispute is with RBS.  The only explanation for why F5 has chosen to litigate in this forum is an effort to avoid the forum selection clause in the Settlement Agreement it signed.

---

[7] *Iragorri v. United Technologies Corp.*, 274 F.3d 65, 72 (2d Cir. 2001) laid out a number of factors a court should consider when determining the appropriate amount of deference:

> [F]actors that argue against forum non conveniens dismissal include the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense.  On the other hand, the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons—such as attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum—the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on a forum non conveniens motion by showing that convenience would be better served by litigating in another country's courts.

*Id.*

England is also an adequate alternative forum.  "An alternate forum ordinarily is available and adequate if the defendants are amenable to process there and it permits litigation of the subject matter of the dispute."  *Chirag v. MT Marida Marguerite Schiffahrts*, 983 F. Supp. 2d 188, 196 (D. Conn. 2013).  RBS, the party against whom F5 actually has a grievance, is unquestionably amenable to service of process in England.  Likewise, there can be no dispute that English courts permit litigation of the subject matter of the dispute, since F5 has previously litigated its claims concerning the Star Bulk shares in England.

To the extent that F5 has a claim that RBSSI is not amenable to service of process in England, this is irrelevant.  *Chirag* is persuasive on this point.  In *Chirag*, plaintiff named as a defendant a company whose sole role in the dispute was that it had acted as the agent for the real defendant in the case.  *Id.* at 196.  After finding that "[a]s a Connecticut-headquartered multinational company, [the agent] appears to be nothing more than a tool to anchor this claim in the U.S. courts," the District Court dismissed the case on *forum non conveniens* grounds.  *Id.*  It noted that "[e]ven if [the agent] refused to stipulate to jurisdiction in [the foreign forum] and otherwise would not be amenable to process there, this lawsuit could proceed against the necessary defendants."  *Id.*  Just like the agent in *Chirag*, RBSSI is "nothing more than a tool to anchor this claim" in Connecticut District Court.  If this case is dismissed on *forum non conveniens* grounds, F5 will still be able to pursue its claims against the necessary defendant – RBS.

Finally, the balance of public and private interest factors also tip in favor of dismissal.  Private interest factors include "the relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses . . . and all other practical problems that make trial of a case easy, expeditious and inexpensive."  *In re Herald*, 540 F. App'x 19, 28 (2d Cir. 2013) *reh'g denied*, 753 F.3d 110 (2d Cir. 2014) (quoting *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501, 508 (1947)).  The vast majority of the witnesses F5 will need to call to prove its case reside in England, or perhaps in the Cayman Islands.  Likewise, evidence relating to whether RBS has breached the Settlement Agreement will be located in England.  No witnesses relating to the central issues in this case – whether the Settlement Agreement entitles F5 to the Star Bulk shares and the steps RBS took to return the shares – are located in the United States.

Public interest factors include "(1) having local disputes settled locally; (2) avoiding problems of applying foreign law; and (3) avoiding burdening jurors with cases that have no impact on their community."  *Id.* at 28-29 (quoting *Capital Currency Exch., N.V. v. Nat'l Westminster Bank PLC*, 155 F.3d 603, 609 (2d Cir. 1998)).  These factors also tip in favor of dismissal.  The choice-of-law clause here requires application of English law.  Even more importantly, this is not a "local dispute."  This is a dispute between two foreign companies – F5 and RBS – arising out of a previous litigation in England and a settlement agreement with a forum selection clause requiring F5's claim to be brought in England.  England is the proper location for F5's suit.

*CONCLUSION*

This Court should reject F5's attempt to do an end-run around its binding contractual obligations to litigate this dispute in England.  This case should be dismissed under the doctrine of *forum non conveniens*.

Respectfully submitted,

/s/ Robert Hoff
Robert S. Hoff (ct27084)
Wiggin and Dana LLP
Two Stamford Plaza
281 Tresser Boulevard
Stamford, CT 06901
Tel: (203) 363-7600
Fax: (203) 363-7676
rhoff@wiggin.com

Timothy A. Diemand (ct18075)
Wiggin and Dana LLP
20 Church Street
Hartford, CT 06103
Telephone: (860) 297-3700
Facsimile: (860) 525-9380
tdiemand@wiggin.com

## CERTIFICATION OF SERVICE

This is to certify that the foregoing memorandum of law was filed electronically this 16th day of January, 2015.  A copy of this memorandum of law will be made available to all counsel of record through the CM/ECF system.

By:  /s/ Robert Hoff