UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| **F5 CAPITAL** | **Case No. 3:14-cv -1469-VLB** |
| **Plaintiff,** | |
| **vs.** | |
| **RBS SECURITIES INC., THE DEPOSITORY TRUST COMPANY** | |
| **Defendants.** | **February 27, 2015** |

PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT RBS SECURITIES INC.'S MOTION TO DISMISS
UNDER THE DOCTRINE OF *FORUM NON CONVENIENS*

**HURWITZ SAGARIN SLOSSBERG
 & KNUFF LLC**
David A. Slossberg (ct13116)
David L. Belt (ct04274)
Jeffrey P. Nichols (ct29547)
147 North Broad Street
P.O. Box 112
Milford, CT  06460
Tel:   (203) 877-8000
Fax:   (203) 878-9800
Email: DBelt@hssklaw.com
        DSlossberg@hssklaw.com
        JNichols@hssklaw.com

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
Mark C. Rifkin (pro hac vice)
Benjamin Y. Kaufman (pro hac vice)
Lydia Keaney Reynolds (pro hac vice)
270 Madison Avenue
New York, NY  10016
Tel: (212) 545-4600
Fax: (212) 957-4514

**SMYSER KAPLAN & VESELKA, L.L.P.**
Larry R. Veselka (pro hac vice
pending)
Tyler G. Doyle (pro hac vice pending)
Hector R. Chavez (pro hac vice
pending)
700 Louisiana Street, Suite 2300
Houston, Texas 77002
Tel: (713) 221-2300
Fax: (713)221-2320

*Attorneys for Plaintiff F5 Capital*

**ORAL ARGUMENT REQUESTED**

Plaintiff F5 Capital ("F5"), by and through its undersigned attorneys, hereby submits this memorandum of law in opposition to the motion of Defendant RBS Securities, Inc. ("RBSSI") to dismiss the complaint under the doctrine of *forum non conveniens*. Defendant RBSSI rests its argument upon a settlement agreement resolving *other* litigation between *different* parties.

For the reasons explained in detail below, Defendant RBSSI's motion suffers from at least three fatal flaws: *first*, RBSSI was not a party to the agreement that purportedly selected the courts of England as the exclusive jurisdiction over different claims asserted in that other, unrelated, litigation; *second*, the present dispute between F5 and RBSSI was never subject to the agreement to settle that other litigation because these claims were never part of that litigation; and *third*, it would be manifestly unjust to require F5 and RBSSI to litigate this dispute over the disposition and accounting for shares of stock held by RBSSI in a depository account within this judicial district in a foreign court an ocean away.

## I.    FACTUAL BACKGROUND

Plaintiff F5, incorporated under the laws of the Cayman Islands, is an investment company principally concerned with investing and dealing in securities in field of international shipping. Complaint ("Compl.") ¶ 2. F5 is owned by Hsin Chi Su,[1] who also owns TMT Co. Ltd. ("TMT"), a Taipei-based

---

[1] Mr. Su is a prominent Asian shipping executive. Among his many accomplishments, Mr. Su holds numerous patents in diverse fields, including liquefied natural gas and oil tanker construction, mobile data transmission

company that maintains an international fleet of shipping carriers. *Id.* In May 2007, TMT opened a Forward Freight Agreement Clearing Account (the "Account") with Royal Bank of Scotland plc or its affiliate ("RBS"). *Id.* ¶ 9. Between 2007 and 2009, RBS made a number of margin calls on the Account, many of which TMT believes were based upon false or manipulated data. *Id.* As a result of the margin calls, despite the dispute, TMT paid RBS more than one hundred million dollars and pledged assets worth tens or hundreds of millions of dollars more to RBS. *Id.*

On February 18, 2009, in response to one such disputed margin call, TMT pledged to RBS 3,000,000 shares of common stock of Star Bulk Carriers Corp. ("Star Bulk"), a publicly-traded company based in the Marshall Islands.[2] Compl. ¶¶ 1, 10. Pursuant to RBS's instruction, the 3,000,000 Star Bulk shares, represented by Share Certificate No. 0127 ("SBC No. 0127"), owned by Plaintiff F5 were delivered to ABN AMRO. *Id.* ¶ 10. ABN AMRO later became Greenwich Capital, and is now known as Defendant RBSSI. *Id.* ¶ 11.

On February 26, 2009, Defendant RBSSI arranged for the Star Bulk shares to be converted into electronic form, ostensibly so that The Depository Trust Company ("DTC") could become the registered holder of the Star Bulk shares. The shares were thereafter placed in "DTC account number 425" belonging to Defendant RBSSI. Compl. ¶ 12. Between November 2008 and September 2012,

---

technology, and a shipping tracking system.

[2] Mr. Su was formerly a director and co-chairman of Star Bulk. Compl. ¶ 7.

Star Bulk declared cash dividends that were paid on the 3,000,000 original Star Bulk shares held by DTC for Defendant RBSSI, which resulted in Defendant RBSSI receiving at least $1,635,000 in cash dividends for and on behalf of Plaintiff F5.  Compl. ¶ 14.

In 2010, Plaintiff F5, TMT, and other related entities sued RBS in London over, among other things, inaccuracies in the statements provided on the Account.  Compl. ¶ 13.  On May 29, 2012, the parties to that litigation entered into a settlement agreement (the "Settlement Agreement", attached as Exhibit A to the Declaration of Craig A. Berry), in which RBS agreed to "take such steps as may be required to release and discharge . . . .[t]he 3 million ordinary shares in Star Bulk Carriers Corporation deposited with [RBS] by [F5 Capital]."  Id.[3]  Thereafter, RBS had no right to hold the shares.  Id.

On October 15, 2012, Star Bulk announced a 15:1 reverse split of its common shares, as a result of which the 3,000,000 shares held by DTC for Defendant RBSSI were converted into 200,000 shares of Star Bulk common stock. Compl. ¶ 15.  After the reverse stock split, in June 2013, Star Bulk announced an offering of up to 14,018,692 new common shares.  Plaintiff F5 instructed RBS to use funds from the cash dividends on the shares pledged by F5 to purchase 305,599 new shares of Star Bulk under the rights offering.  Id. ¶ 16.  In November 2013, F5 instructed RBS to transfer 92,000 of these shares to a third party

_____

3 For reasons unrelated to this litigation or the pending motion to dismiss, Plaintiff F5 disputes the enforceability of the Settlement Agreement.

pursuant.  However, from the few documents that RBSSI has provided to F5 since this action was commenced, F5 has discovered that RBS transferred 92,000 shares of the *original* 200,000 shares to the third party.  Thus, all 305,599 of the new Star Bulk shares were *never* subject to the pledge and should have been delivered to Plaintiff F5, but have never been delivered to it.[4]

When this action was commenced on October 3, 2014, Defendant RBSSI held at least 413,599 Star Bulk shares – the remaining 108,000 shares of the stock originally pledged by TMT plus the new 305,599 shares acquired with the cash dividends paid on those shares that were *never* pledged by TMT – in its DTC

---

[4] Plaintiff F5 commenced this action, in part, to determine whether Defendant RBSSI properly complied with its instructions regarding the Star Bulk shares, to determine what RBSSI has done with the shares, to determine whether RBSSI profited from the shares in any other way, and to and obtain a proper accounting for the dividends and interest earned on the shares during the time RBSSI held them.  RBSSI stridently opposed F5's discovery requests and sought to stay discovery, but on January 16, 2015, this Court ordered Defendant to respond to Plaintiff's discovery.  Discovery has not yet been produced.  However, the handful of documents that RBSSI has provided to F5 since the Complaint was filed shows that RBSSI has been less than forthcoming about its actions while it held the shares, raising more questions than it answers.  All this may explain why what should have been a quick, easy transaction – RBSSI promptly returning the Star Bulk shares to F5 – has been anything but simple.

account.  Compl. ¶ 17.  During the year before the action was commenced, Defendant RBSSI acknowledged that the shares it held were at all times at least beneficially owned by Plaintiff F5; RBSSI acknowledged F5's interest in the shares; and RBSSI asserted no claim over or right to the shares.  *Id.* ¶ 18.  And as Defendant RBSSI now admits, after this action was commenced, a certificate indicating that 413,599 Star Bulk shares were being transferred to Plaintiff was belatedly delivered to Plaintiff F5 on October 27, 2014.  The remaining dispute concerns the accounting by Defendant RBSSI for the Star Bulk shares while they were in its possession or control, for interest owed to Plaintiff F5, and for dividend payments due to F5 before and after September 2012.  *See* Compl. ¶ 20.

II.   **LEGAL ARGUMENT**

   A.   **Legal Standards**

   The parties agree that under Second Circuit precedent, a motion to dismiss based upon a forum selection clause cannot be granted unless the following four conditions are met:

   1) the clause was reasonably communicated to the party resisting enforcement;
   2) the clause is mandatory rather than permissive,  *i.e.*, the parties are required to bring any dispute to the designated forum, not simply permitted to do so;
   3) the claims and parties involved in the action are subject to the forum selection clause; and
   4) the opposing party has not made a sufficiently strong showing that "enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching."

*See Phillips v. Audio Active, Ltd.*, 494 F.3d 378, 383-84 (2d Cir. 2007) (citations omitted) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972)).

   All four conditions are mandatory: if any one of the first three conditions is

5

not met, or if the party opposing dismissal makes the requisite showing under the fourth condition, then the motion must be denied. In addition, when considering a motion to dismiss based upon a forum selection clause, this Court may rely upon the pleadings and affidavits, but "must conduct an evidentiary hearing to resolve disputed factual questions in favor of the defendant." *Martinez v. Bloomberg LP*, 740 F.3d 211, 216-17 (2d Cir. 2014) (citing *New Moon Shipping Co., Ltd. v. MAN B & W Diesel AG*, 121 F.3d 24, 29 (2d Cir. 1997)).

Defendant RBSSI's motion cannot meet the third required condition. The Settlement Agreement setting forth the forum selection clause resolved *other* litigation between *different* parties. Although the Settlement Agreement is broadly worded, it is not unbounded. It does not cover the specific claims asserted by Plaintiff F5 against Defendant RBSSI in this action. Indeed, Defendant RBSSI was not even mentioned in the Settlement Agreement, nor were any claims regarding an accounting for the Star Bulk shares while in RBSSI's possession, for interest owed to Plaintiff F5, and for dividend payments due to F5 before and after September 2012 mentioned in the Settlement Agreement or resolved by it. As discussed in Section B, nothing in the record supports a conclusion that Plaintiff F5's specific claims against Defendant RBSSI in this action are subject to the forum selection clause in the Settlement Agreement resolving that other litigation between those different parties. For that reason, absent an evidentiary hearing, the Court cannot dismiss the present action under the doctrine of *forum non conveniens*.

But even if the Court were to conclude that the first three conditions were all met, Plaintiff F5 makes a sufficiently strong showing that enforcement of the forum selection clause would be unreasonable or unjust in this case.  The claims remaining in this case all concern Defendant RBSSI's actions while in possession of the Star Bulk shares in a depository account at DTC in this judicial district: RBSSI's improper accounting for the Account; RBSSI's failure to pay interest to F5, and RBSSI's failure to make dividend payments to F5.  As discussed in Section C, it would be manifestly unreasonable and unjust to require Plaintiff F5 to litigate these claims against Defendant RBSSI in England.

**B.     The Claims and Parties in This Action Are Not Subject to the Forum Selection Clause in the Settlement Agreement in the London Action**

Neither Defendant RBSSI, nor the claims alleged by Plaintiff in this action, is subject to the Settlement Agreement or its forum selection clause.  Therefore, according to the Second Circuit's four-part test set forth in *Phillips*, the forum selection clause does not apply and this action is properly before this Court.

**1.     Defendant RBSSI Is Not a Signatory to the Settlement Agreement and Cannot Enforce the Forum Selection Clause**

Defendant RBSSI lacks standing under the Settlement Agreement and, therefore, is barred from enforcing the forum selection clause against F5 because it was neither a party to the Settlement Agreement nor a "foreseeable" beneficiary of it.  Indeed, the Settlement Agreement expressly and conclusively forecloses RBSSI from invoking the forum selection clause against Plaintiff F5.  The Settlement Agreement provided, "No person *other than the Parties* may enforce any rights arising out of or under this Agreement by virtue of the Contracts (Right

7

of Third Parties) Act 1999."  Settlement Agreement, ¶ 10 (emphasis added).[5]
Thus, under its clear and express terms, the Settlement Agreement conferred no
rights upon RBSSI, and RBSSI has no right to enforce any of its terms.

When there is no provision like the one in the Settlement Agreement
prohibiting all non-parties from exercising any rights thereunder, a non-signatory
may seek to enforce a forum selection clause, but only if the non-signatory is
"closely related" to a signatory.  *See Magi XXI, Inc. v. Stato della Città del
Vaticano*, 714 F.3d 714, 722 (2d Cir. 2013); *Kasper Global Collection & Brokers,
Inc. v. Global Cabinets & Furniture Mfrs., Inc.*, 952 F. Supp. 2d 542, 561-62
(S.D.N.Y. 2013) (same).

In *Magi XXI*, the Second Circuit found a sufficiently close relationship
between the Vatican and Second Renaissance, two defendants in that case,
where: (i) the plaintiff consented to the same exclusive jurisdiction clause in its
sub-license with Second Renaissance as in the Master License Agreement
between the Vatican and Second Renaissance; (ii) the plaintiff was aware of the
Master License Agreement, under which the plaintiff entered into the sub-license
with Second Renaissance; (iii) the sub-license was subject to the Vatican's
approval; and (iv) the plaintiff alleged that the signatory and non-signatory acted

---

[5] The Contracts (Right of Third Parties) Act 1999 is an Act of the Parliament of the
United Kingdom that reformed British common law to permit third parties to
enforce contracts in some circumstances.  However, the Settlement Agreement
clearly provided that no such third-party enforcement would be permitted.

"in concert" to commit the alleged fraud *Id.* at 723-24. For those reasons, the Second Circuit concluded it was "foreseeable" to the plaintiff that the Vatican would seek to enforce its own identical forum selection clause against it. *Id.* (quoting *M/S Breman*, 407 U.S. at 12; internal citations omitted). *See also In re Optimal U.S. Litig.*, 813 F. Supp. 2d 351, 369-70 (S.D.N.Y. 2011) (non-signatory may enforce forum selection clause when contract at issue discloses that agents of signatory may be engaged to provide services under the contract and non-signatory is known to plaintiff).

None of those facts are present here. The only fact supporting Defendant RBSSI's argument is that it is a wholly-owned subsidiary of RBS. However, the mere fact that a non-signatory is a corporate affiliate of a signatory to a contract containing a forum selection clause does not entitle the affiliate to invoke the forum selection clause. *Dayhoff Inc. v. H.J. Heinz Co.*, 86 F.3d 1287, 1297 (3d Cir. 1996). In *Dayhoff*, under nearly the same circumstances as present here, the Third Circuit held that non-signatories "should not by reason of their corporate relationship with [signatories] be able to invoke the arbitration and forum selection clauses, for there is no more reason to disregard the corporate structure with respect to such claims as there would be to disregard it with respect to other legal matters." *Id.*

In this case, unlike those cases cited by RBSSI, RBSSI was *not* disclosed to F5, F5 was *not* told that RBSSI would hold the Star Bulk shares in its account or have any role in holding the shares, and F5 has *not* alleged that RBS and RBSSI acted jointly to commit the wrongs complained of in this action. Thus, the mere

9

fact that RBSSI is a subsidiary of RBS does not make it a "foreseeable" enforcer of the Settlement Agreement.  Neither RBSSI nor any other "agents," "affiliates," or "subsidiaries" of RBS are referenced in the Settlement Agreement.  In fact, the Settlement Agreement itself explicitly prohibits all non-parties from enforcing the contract.  Settlement Agreement, ¶ 10.  A wholly-owned subsidiary such as RBSSI is a separate legal entity and does not automatically assume the contractual rights of its parent.  *See, e.g., N.Y. State Elec. & Gas Corp. v. FirstEnergy Corp.*, 766 F.3d 212, 224 (2d Cir. 2014) ("parent is considered a legally separate entity from its subsidiary, and cannot be held liable for the subsidiary's actions based solely on its ownership of a controlling interest in the subsidiary"); *Dayhoff*, 86 F.3d at 1297.  Furthermore, as defined in the Settlement Agreement, the parties thereto do *not* include their subsidiaries or affiliates, such as RBSSI.

Because RBSSI was never named or referred to in the Settlement Agreement, and because the plain language of the Settlement Agreement precludes any third-party enforcement, Defendant RBSSI is barred from enforcing the forum selection clause against F5.[6]

_____

[6] The cases relied upon by Defendant RBSSI (Def. Br. at 15) to support its assertion that Plaintiff F5 is "forum shopping" are inapposite.  In *Doctor's Assoc., Inc. v. Stuart*, 85 F.3d 975 (2d Cir. 1996), the court found that an arbitration agreement between franchisee and franchisor applied to action brought by franchisee against owners and agents of franchisor when franchisor would be legally responsible for damages.  Here, RBS is in no way legally responsible for

10

Significantly, only the parties to the Settlement Agreement submitted to the jurisdiction of the English courts to litigate claims covered by the Settlement Agreement: "for these purposes, *each party* irrevocably submits to the jurisdiction of the courts of England." *See* Settlement Agreement ¶ 13.2 (emphasis added). Since Defendant RBSSI was *not a party* to the Settlement Agreement, *it* did not submit to the jurisdiction of the courts of England for any purpose. Although RBSSI's parent, RBS, consented to the jurisdiction of the English courts, it did not do so for its subsidiary, RBSSI. Jurisdiction over a parent company does not extend to its subsidiaries. *Universal Trading & Inv. Co. v. Credit Suisse (Guernsey) Ltd.*, 560 F. App'x 52, 55 n.1 (2d Cir. 2014) (citing *Volkswagenwerk Aktiengesellschaft v. Beech Aircraft Corp.*, 751 F.2d 117, 120 (2d Cir. 1984)). Absent jurisdiction over RBSSI, the English courts could not adjudicate *any* dispute between Plaintiff F5 and RBSSI.

Finally, English law does not trump the express terms of the Settlement Agreement prohibiting non-signatories such as RBSSI from enforcing any of its

---

any damages incurred by RBSSI. *See N.Y. State Elec. & Gas Corp.*, 766 F.3d at 224. In *Aguas Lenders Recovery Grp. v. Suez, S.A.*, 585 F.3d 696, 701 (2d Cir. 2009), also cited by Defendant, the court reached the unremarkable conclusion that a non-signatory successor-in-interest may enforce a forum selection clause signed by its predecessor, and then remanded the case to the district court to determine the issue of successorship. Here, RBSSI does not claim to be a successor to RBS, making that decision irrelevant.

11

terms.  In *Martinez v. Bloomberg LP*, 740 F.3d 211, 214 (2d Cir. 2014), cited by Defendant (Def. Br. at 13-14), the plaintiff sued his former employer for discrimination.  Martinez's employment agreement with Bloomberg included a choice of law and forum selection clause, which provided that "English law governed the agreement and that any dispute arising hereunder shall be subject to the exclusive jurisdiction of the English courts." *Id.* (footnote omitted).  Since both Martinez and Bloomberg were signatories to the agreement, that case did not address whether English law recognized a non-signatory's right to enforce a forum selection clause.[7]

> 2.    **Plaintiff's Claims Do Not "Arise From" or "Relate To" the Settlement Agreement**

Even if the Court determines that Defendant RBSSI may invoke the forum selection clause despite the express terms of the Settlement Agreement, RBSSI is barred from enforcing the forum selection clause because the Settlement Agreement does not cover the claims asserted in this action.  Plaintiff F5's claims

---

[7] Defendant cites English cases, all of which were cited in *Martinez*, but these cases have no bearing on this action.  All three cases – *Fiona Trust & Holding Corp. v. Privalov*, [2007] EWCA (Civ) 20, *Fili Shipping v. Premium Nafta Prods. Ltd.*, [2007] UKHL 40, and *Skype Techs. SA v. Joltid Ltd.*, [2009] EWHC (Ch) 2783, arose out of dispute between two signatories to an arbitration agreement, and held that such arbitration agreements generally apply to any dispute arising out of the contract at issue between the two parties.  None of the cases involve the enforcement of a forum selection by a non-signatory against a signatory.

in this case are wholly and completely separate from, and unrelated to, the Settlement Agreement. "The scope of a forum selection clause is a contractual question that requires the courts to construe the clause, and where, ambiguous, to consider the intent of the parties." *Kasper*, 952 F. Supp. 2d at 561-62 (quoting *New Moon Shipping Co., Ltd. V. Man B&W Diesel AG*, 121 F.3d 24, 33 (2d Cir. 1997)). "A court thus must 'examine the substance of the claims, shorn of their label' and compare how they relate to the language of the given forum-selection clause." *Id.* (quoting *Phillips*, 494 F.3d at 388).

In *Phillips*, the Second Circuit narrowly construed the term "arising out of" as meaning "to originate from a specified source," but *not* "encompassing all claims that have some possible relationship with the contract." *Phillips*, 494 F.3d at 389 (citing Webster's Third New International Dictionary 117 (1981)). While some courts have construed forum selection clauses that include "relate to" language more broadly,[8] there must be *some* connection between the contract at issue and the claims asserted by the plaintiff. *Id.*; *see also Kasper*, 952 F. Supp. 2d at 561-62. Here, no such link exists.

The Settlement Agreement resolved a lawsuit brought by TMT and other entities controlled by Mr. Su against RBS. Compl. ¶ 13. The plaintiffs commenced that action after uncovering several inaccuracies in statements prepared by RBS for TMT's Account with RBS. Compl. ¶ 13. Those claims arose out of RBS's handling of TMT's Account – they had nothing to do with the claims

---

[8] *Cf. In re Optimal U.S. Litig.*, 813 F. Supp. 2d at 369-70.

asserted by Plaintiff in this action.  Indeed, the claims asserted by Plaintiff in this action arise exclusively out of Defendant RBSSI's failure to account for any interest or dividends on the Star Bulk shares that accrued during the time period when RBSSI held Plaintiff's shares in Star Bulk, including shares that were never subject to the Settlement Agreement.  The Settlement Agreement merely provided that, in exchange for a certain sum of money, RBS would release to F5 the Star Bulk shares that it held on F5's behalf. The Settlement Agreement did not address: (a) RBS's transfer of the shares to RBSSI; (b) how RBSSI was to handle the shares; (c) how RBSSI was to distribute dividends paid on the shares; (d) how RBSSI was to calculate and distribute any interest earned on the shares; or (e) how RBSSI was to account for the shares to Plaintiff.  These issues – not any claims arising out of the mismanagement of TMT's Account or, for that matter, the return of the Star Bulk shares to F5 – are the subject of this litigation, and they are not addressed by the Settlement Agreement.

Even more importantly, after accounting for the 15:1 reverse stock split, the Settlement Agreement covered only 200,000 Star Bulk shares transferred to RBS by F5 in February 2008.  More than five years later, in a separate transaction, in June of 2013, F5 instructed RBS to acquire 213,599 additional Star Bulk shares on its behalf.  The Settlement Agreement did not provide that RBS would have any right to shares subsequently purchased by F5, even if purchased with the proceeds of dividends paid on the original shares transferred.  The additional 213,599 shares, which constituted more than half of the Star Bulk shares held by RBSSI, were never subject to the Settlement Agreement, which had been

executed *more than a year before* those new shares were even acquired.  Thus, there is no way that any claim arising out of those shares could possibly "arise out of" or "relate to" the Settlement Agreement.[9]

      C.    <u>Plaintiff F5 Did Not Sue the Wrong Party</u>

Defendant RBSSI's primary argument is that it has the exact same rights under the Settlement Agreement as RBS because the two companies are so "closely related."  As a fall-back, relying on the fact that the two companies are, in fact, separate entities, RBSSI pivots to argue that F5 purportedly has sued it only to avoid the forum selection clause in the Settlement Agreement with RBS. *See* Def. Br. at 15-16.  RBSSI's fall-back argument is plainly wrong.

F5 sued RBSSI because *RBSSI* was in physical possession of the original stock certificate when this action was commenced – a fact RBSSI does not contest.  F5 also sued RBSSI because, at the time, *RBSSI* held 108,000 of the original shares pledged by TMT *plus* the new 213,599 shares acquired with the

---

[9] Defendant RBSSI argues that because Plaintiff F5 directed RBS to use funds from dividends on its existing Star Bulk stock to purchase the additional Star Bulk stock, claims regarding all of the Star Bulk shares are "related to" the Settlement Agreement. Def. Br. at 12-13.  The Settlement Agreement itself did not give RBS any right to shares subsequently purchased by F5, whatever source of the cash F5 used to acquire them, and RBSSI provides no support for its implicit argument that shares purchased with cash dividends are somehow subject to such an agreement; to F5's knowledge, no such support exists.

cash dividends paid on the original shares that were subject to the Settlement Agreement in its account with DTC – also facts that RBSSI does not contest.  *See* Compl. ¶ 17.  That much of the case has been resolved, because all 413,599 Star Bulk shares have been returned to F5.  F5 also sued RBSSI because it believes that *RBSSI* misused the stock while it was in RBSSI's, rather than RBS's, possession, custody, or control.  F5 also believes that *RBSSI* improperly accounted to F5 for interest on cash dividends paid and failed to account properly for the stock while it was in RBSSI's possession, custody, or control. Compl. ¶¶ 20-21.

None of the cases cited by RBSSI supports its argument that F5 has sued the wrong party, either to avoid the forum selection clause in the Settlement Agreement with RBS or for any other reason.  *Aguas Lenders Recovery Grp.*, 585 F.3d at 710, is completely irrelevant because there is no question of successor liability in this case: RBSSI is not a successor-in-interest to RBS, and no one alleges or argues otherwise.  In *Doctor's Associates, Inc. v. Stuart*, 85 F.3d 975 (2d Cir. 1996), the defendants were franchisees of two Subway sandwich shops in Illinois.  The franchise agreements the defendants signed compelled them to arbitrate any dispute in Bridgeport, Connecticut.  The Second Circuit concluded that an action by the franchisees in Illinois state court against the franchisor and its owners and agents was a sham attempt to avoid the contractual duty to arbitrate their dispute with the franchisor.  *Id.* at 985.  RBSSI does not argue that F5 sued any other party (such as DTC) to avoid any purported contractual obligation to litigate with RBSSI in any particular forum, since F5 signed no

16

contract requiring it to do so.  In *Doctor's Associates, Inc. v. Hollingsworth*, 949 F. Supp. 77, 84 (D. Conn. 1996), this Court found that a state court action by 31 other Subway franchisees against the owners of the franchisor and several of its affiliates, but not against the franchisor itself, was merely an attempt to avoid the arbitration clause in the franchise agreement they all signed.  Unlike that case, F5 has not sued RBSSI's owner or any other affiliates to avoid any agreement requiring it to litigate with RBSSI in a different forum, again since F5 signed no contract requiring it to do so.[10]

RBSSI's reliance on UCC 8-115 is also entirely misplaced.  RBSSI argues it

-------------------

[10] RBSSI fares no better under the two other cases it has cited.  In *Midamines SPRL Ltd. v. KBC Bank NV*, No. 12-cv-8089, 2014 U.S. Dist. LEXIS 37731 (S.D.N.Y. Mar. 18, 2014), the court enforced the bank's forum selection clause against a non-signatory plaintiff because the plaintiff was a corporate officer and proxy holder for the owner of the account that was the source of the claim.  In *Vertucci v. Orvis*, No. 3:05-cv-1307, 2006 U.S. Dist. LEXIS 39320 (D. Conn. May 30, 2006), this Court held that a plaintiff who signed an arbitration agreement with her law firm could not avoid the duty to arbitrate her negligence claim by suing the individual attorneys instead of the law firm itself.  In those cases, the *same* claims were brought against the wrong parties.  Here, F5's claims against RBSSI are *different* than its settled claims against RBS.  Were they in fact the same claims, RBSSI would have moved to dismiss the claims pursuant to the release in the Settlement Agreement, not just to dismiss for *forum non conveniens*.

cannot be held liable to F5 because it only "'acted at the direction of its customer' RBS with regard to the Star Bulk shares." Def. Br. at 16. RBSSI's fact-based argument is well beyond the scope of the Complaint and, thus, it cannot be considered on a motion to dismiss. *Leonard F. v. Israel Discount Bank*, 199 F.3d 99, 107 (2d Cir. 1999). Certainly, UCC 8-115, which RBSSI invokes as an affirmative defense, does not establish that F5 has sued the wrong party as a matter of law.

D.   **It Would be Manifestly Unreasonable and Unjust to Force Plaintiff to Litigate this Case in England**

Even if the Court were to determine that the parties and claims set forth in this action are governed by the Settlement – which they are not – the Court nonetheless must reject Defendant RBSSI's motion to dismiss on the grounds of *forum non conveniens* because it would be manifestly unreasonable and unjust to force Plaintiff to litigate its claims against RBSSI in England. *Kasper*, 952 F. Supp. 2d at 565.

When determining whether to defer to a plaintiff's choice of forum, the Second Circuit considers, *inter alia*, the "availability of witnesses or other evidence to the forum" and the "defendant's amenability to suit in the forum." *Frederiksson v. HR Textron, Inc.*, 484 F. App'x 610, 612 (2d Cir. 2012). Not only does Defendant maintain its principal place of business in Connecticut (Compl. ¶ 3), but all of the witnesses, key documents, and other evidence and facts relevant to Plaintiff's claims are located in this district. It would be utter nonsense for F5 to be forced to litigate this case against a Connecticut defendant, relying upon Connecticut-based evidence and witnesses, in England. Of course, the difficulty

and unfairness of requiring F5 to sue RBSSI in England is compounded by the fact that the courts of England have no jurisdiction over RBSSI, and certainly no jurisdiction over DTC, from which document discovery and deposition testimony certainly will be required.  The mere fact that F5 previously brought different claims against a different party in an English court is wholly irrelevant.

Therefore, even if the Court were to conclude that RBSSI may enforce any rights under the Settlement Agreement and that the forum selection clause covers the claims asserted in this case, it still should deny RBSSI's motion to dismiss under the doctrine of *forum non conveniens* since the courts of England are a much less convenient (and unavailable) forum in which these claims may be litigated.

III.    <u>CONCLUSION</u>

For all the foregoing reasons, the Court should deny Defendant RBSSI's motion to dismiss under the doctrine of *forum non conveniens*.

Dated:  February 27, 2015

Respectfully submitted,

HURWITZ SAGARIN SLOSSBERG
 & KNUFF LLC

By:    /s/ David A. Slossberg
        David A. Slossberg (ct13116)
        David L. Belt (ct04274)
        Jeffrey P. Nichols (ct29547)
        147 North Broad Street
        P.O. Box 112
        Milford, CT  06460
        Tel:  (203) 877-8000
        Fax: (203) 878-9800
        Email: DBelt@hssklaw.com
              DSlossberg@hssklaw.com
              JNichols@hskklaw.com

19

Mark Rifkin (pro hac vice)
Benjamin Y. Kaufman (pro hac vice)
Lydia Keaney Reynolds (pro hac vice)
**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**
270 Madison Avenue
New York, NY  10016
Tel: (212) 545-4600
Fax: (212) 957-4514

Larry R. Veselka (pro hac vice pending)
Tyler G. Doyle (pro hac vice pending)
Hector R. Chavez (pro hac vice pending)
**SMYSER KAPLAN & VESELKA, L.L.P.**
700 Louisiana Street, Suite 2300
Houston, Texas 77002
Tel: (713) 221-2300
Fax: (713)221-2320

*Attorneys for Plaintiff F5 Capital*

## CERTIFICATE OF SERVICE

This is to certify that on February 27, 2015, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system and by mail to all parties that are unable to accept electronic filing.  Parties may access this filing through the Court's electronic system.

/s/ David L. Belt_____
David L. Belt

21