## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| F5 CAPITAL, | : | |
|     Plaintiff, | : | |
| | : | **CIVIL ACTION NO.** |
| v. | : | **3:14-cv-1469 (VLB)** |
| | : | |
| RBS SECURITIES INC. AND THE | : | **September 30, 2015** |
| DEPOSITORY TRUST COMPANY, | : | |
|     Defendants. | : | |

### MEMORANDUM OF DECISION GRANTING DEFENDANT RBSSI'S MOTION TO DISMISS UNDER THE DOCTRINE OF FORUM NON CONVENIENS [Dkt. #26]

Plaintiff F5 Capital ("F5") brings a five-count state law complaint for conversion, civil theft, negligence, replevin, and an accounting against Defendants RBS Securities Inc. ("RBSSI") and the Depository Trust Company ("DTC") in connection with their holding and refusing to turn over to Plaintiff shares in non-party Star Bulk Carriers Corp. ("Star Bulk"). For the reasons that follow, RBSSI's Motion to Dismiss is GRANTED.

## I.    Factual Background[1]

Plaintiff F5 is one of several entities owned by non-party Hsin Chi Su (the "Su Entities"). [Dkt. #1, Compl. at ¶ 2]. In May 2007, one of the Su Entities, TMT Co. Ltd. ("TMT"), opened a trading account with non-party Royal Bank of Scotland plc ("RBS"). [*Id.* at ¶ 9]. From 2007 through 2009, RBS made a number of margin calls on the account, which resulted in TMT pledging to RBS millions of dollars in assets. [*Id.*]. Among the pledged assets were 3,000,000 shares of Star Bulk securities, which TMT delivered to RBS in November 2008. [*Id.* at ¶ 10]. The shares belonged to Plaintiff F5, who acquired them on or around July 9, 2008. [*Id.*

---

[1] The Court recites only those facts necessary to resolve the Defendant's motion.

at ¶ 8].  On February 18, 2009, RBS sent the paper shares to RBSSI.  [*Id.* at ¶ 11].[2] The shares were subsequently converted into electronic form, and are currently held by Defendant DTC, in an account for RBSSI.  [*Id.* at ¶ 12].  Plaintiff contends that "RBS and RBSSI did not have the authority to convert F5's stock certificate for the shares in question to an electronic form."  [*Id.* at ¶ 25].  RBSSI asserts no present claim over these shares.  [*Id.* at ¶ 18].

In 2010, after receiving these margin calls, Plaintiff and several other Su Entities sued RBS in England.  [*Id.* at ¶ 13].  On May 29, 2012, the parties entered into a settlement agreement (the "Agreement").  [*Id.*].  The parties to the Agreement were Plaintiff F5, the other Su Entity plaintiffs, and RBS.  [*Id.*]. Defendant RBSSI was not a party to this Agreement.  [*Id.*].  The Agreement provided that, in exchange for cash payments from the Su Entity plaintiffs, RBS agreed to return some of the collateral pledged by TMT, including the 3,000,000 shares of Star Bulk securities belonging to Plaintiff F5.  [*Id.*].  Specifically, the Agreement states:

> Upon receipt of the Settlement Payment in accordance with the terms of this Agreement, [RBS] agrees, itself or by its solicitors Ashurst LLP, to . . . take such steps as may be required to release and discharge, to the [Su Entity plaintiffs] as appropriate, the security held by [RBS], as set out in Schedule 3 . . . ."

[Dkt. #26-2, Ex. A to Berry Decl. at ¶ 1.7(b)].

Among the securities listed in Schedule 3 of the Agreement are "[t]he 3 million ordinary shares in Star Bulk Carriers Corporation deposited with [RBS] by [F5 Capital]."  [*Id.* at 11, ¶ 2].

---

[2] RBSSI is a wholly-owned subsidiary of RBS Holdings USA Inc. ("RBS Holdings"), which itself is an indirect wholly-owned subsidiary of RBS.  [*Id.* at ¶ 3].

In addition, the Agreement contains a provision precluding reliance on the Contracts (Rights of Third Parties) Act 1999, a particular piece of English law, as a basis for asserting rights under the Agreement: "No person other than the Parties may enforce any rights arising out of or under the Agreement by virtue of the Contracts (Rights of Third Parties) Act 1999."[3]  [*Id*. at ¶ 10].

Finally, the Agreement contains choice-of-law and forum selection clauses, which lie at the heart of the present dispute and state:

> This Agreement and any dispute, controversy, proceedings, or claim of whatever nature arising out of or in any way relating to this Agreement or its formation (including any non-contractual disputes or claims), shall be governed by and construed in accordance with English law.

> The Parties agree that the courts of England have exclusive jurisdiction to hear and decide any action or proceedings, and/or to settle any disputes, which may arise out of or in any way relate to this Agreement or its formation and, for these purposes, each party irrevocably submits to the jurisdiction of the courts of England

[*Id*. at ¶¶ 13.1-13.2].

Following the execution of this Agreement, Plaintiff contends that, despite providing RBS with its consideration under the Agreement and repeated requests, RBSSI has failed to transfer all rights for control and disposition of the Star Bulk Shares to F5.  [Dkt. #1, Compl. at ¶¶ 13, 19].  Instead, Plaintiff alleges that "RBS and RBSSI have held the Star Bulk shares hostage in an attempt to extract unwarranted legal concessions from F5."  [*Id*. at ¶ 21].  Specifically, "requests by F5 that RBS release the Star Bulk shares largely have been met with

---

[3] "Under the English Contracts (Rights of Third Parties) Act 1999, third parties may enforce contractual terms if 'the contract expressly provides' that they may do so."  *Oei Hong Leong v. Goldman Sachs Grp., Inc.*, No. 13-cv-8655 (JMF), 2014 WL 2893310, at *5 (S.D.N.Y. Jun. 25, 2014) (citing Contracts (Rights of Third Parties) Act, 1999, c. 31 § 1 (Eng.)).

obstruction" and "RBS repeatedly refused any transfer by demanding in return an additional and much broader release from F5 than was provided for in the 2010 RBS litigation." [*Id.* at ¶ 22]. Also, "RBS through its subsidiary Defendant RBSSI still exercises possessory ownership rights over F5's Star Bulk shares, depriving F5 [of] its right of possession and custody over its assets." [*Id.* at ¶ 27].[4]

In addition, F5 pleads that it has "repeatedly [] asked RBS for assurances concerning the precise accounting used by RBSSI to value the Star Bulk shares, calculate interest due F5, and determine the dividend payments due to F5." [*Id.* at ¶ 20]. Plaintiff asserts that there are "unresolved liabilities related to RBS's handling of F5's . . . accounts and assets . . . ." [*Id.* at ¶ 24].[5]

II.   Legal Standard

Defendant RBSSI contends that § 13.2 of the Agreement grants the courts of England exclusive jurisdiction over this dispute and moves to dismiss the action under the doctrine of *forum non conveniens*. "Relying on the pleadings and affidavits, courts employ a four-step analysis to determine whether to

---

[4] Counts I, II, and IV of the Complaint sound in conversion, civil theft, and replevin, and are all based on Plaintiff's loss of possession of its Star Bulk shares. *See* [Dkt. #1, Compl. at ¶¶ 29 (conversion claim based on allegation that plaintiff was "wrongfully and without lawful authority deprived [] of possession of the property"); 34 (civil theft claim based on Defendant RBSSI's "refus[al] to unilaterally return full possession and custody of the Star Bulk shares to F5" and its efforts to "wrongfully continue[] to exercise dominion over F5's assets"); 41-42 (replevin claim based on wrongful detention of property to which "Plaintiff has immediate right of possession")]. Nevertheless, the only Defendants named in any of these counts are RBSSI and DTC.

[5] In Count V of the Complaint, Plaintiff brings a claim for an accounting, "for any interest, dividends, commissions, remunerations, or benefits that RBSSI directly or indirectly has realized or may realize as a result of or in connection with their possession or control of the shares." [Dkt. #1, Compl. at ¶ 46]. However, Plaintiff names only Defendants RBSSI and DTC in this count. [*Id.* at 8, Count V.].

4

dismiss a claim based on a forum selection clause." *Arial Techs., LLC v. Aerophile S.A.*, No. 14 CV 4435 (LAP), 2015 WL 1501115, at *2 (S.D.N.Y. Mar. 31, 2015) (citing *Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014). In this analysis, courts consider: "(1) 'whether the clause was reasonably communicated to the party resisting enforcement'; (2) whether the clause is mandatory or permissive, i.e., . . . whether the parties are *required* to bring any dispute to the designated forum or simply *permitted* to do so'; and (3) 'whether the claims and parties involved in the suit are subject to the forum selection clause.'" *Id.* (quoting *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383 (2d Cir. 2007) (emphasis in original)). Once the first three portions of this test are established, the clause "is presumptively enforceable." *Id.* The resisting party can overcome this presumption only by "(4) 'making a sufficiently strong showing that 'enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching.'" *Id.*

Where, as here, the Agreement also contains a choice-of-law clause, "questions relating to the interpretation of the contract are properly resolved according to the law chosen by the parties." *Id.* (citing *Martinez*, 740 F.3d at 217-18). Thus, the Second Circuit has determined that steps two and three are governed by the law contractually selected by the parties, while step four is governed by federal law. *Id.* Although this is the general rule, a court need not apply foreign law to interpret a forum selection clause unless the parties do so. *Id.* Accordingly, the Court will examine English law where the parties rely on it. However, the Court notes that, other than mentioning the Contracts (Right of

Third Parties) Act 1999 and relying on federal cases which themselves reference English law, the parties do not rely on English law.[6]  Accordingly, in resolving the Defendant's motion, the Court will apply "general contract law principles and federal precedent" under the four-part *Phillips* framework.  *Id.* at *3.

III.   <u>Analysis</u>

As an initial matter, Plaintiff does not challenge enforcement of the forum selection clause under the first two parts of this test, nor would such a challenge have merit.  *See U.S. ex rel. QSR Steel Corp., LLC v. Safeco Ins. Co. of Am.*, No. 3:14-cv-1017 (VAB), 2015 WL 4393576, at *6 (D. Conn. Jul. 16, 2015) (a forum selection clause has been reasonably communicated when it is "clear, appears on the face of the contract, and the parties signed it") (citation omitted); *Global Seafood Inc. v. Bantry Bay Mussels Ltd.*, 659 F.3d 221, 225 (2d Cir. 2011) ("A forum selection clause is considered mandatory where . . . it confers exclusive jurisdiction on the designated forum . . . ."); *see also* [Dkt. #26-2, Ex. A to Berry Decl. at ¶ 13.2 ("The Parties agree that the courts of England have exclusive jurisdiction to hear and decide any action or proceedings . . . any disputes, which may arise out of or in any way relate to this Agreement . . . .")].  Accordingly, the Court turns to the third and fourth parts of the *Phillips* analysis.

---

[6] **In its opening brief, Defendant cites and quotes a Second Circuit decision, *Martinez v. Bloomberg LP*, 740 F.3d 211 (2d Cir. 2014), which cites and quotes three English law cases.  *See* [Dkt. #26-1, Def.'s Memo. in Supp. of Mot. to Dismiss at 13-14]; *Martinez*, 740 F.3d at 224-225, 227.  The purpose of these citations is to illustrate that English law is consistent with the law of this Circuit regarding the general treatment and scope of foreign selection clauses; not to interpret the meaning and scope of the forum selection clause in § 13.2 of the Agreement.  Similarly, in its Opposition, Plaintiff mentions the Contracts (Right of Third Parties) Act 1999 and addresses the facts in the three English cases cited by Defendant.  *See* [Dkt. #50, Pl.'s Opp. at 8 n. 5, 12 n. 7].**

A.   **The Settlement Agreement Covers the Parties and Claims in this Action**

1.   **Nonsignatory RBSSI May Invoke the Forum Selection Clause**

Under the third part of this test, Plaintiff initially contends that RBSSI is not a signatory to the Agreement and therefore cannot enforce the forum selection clause.  *See* [Dkt. #50, Pl.'s Opp. at 8].  Plaintiff acknowledges that "a non-signatory may seek to enforce a forum selection clause" when that party is "closely related" to a signatory.  [*Id.* (citing and quoting *Magi XXI, Inc. v. Stato della Città del Vaticano*, 714 F.3d 714, 722 (2d Cir. 2013) and *Kasper Global Collection & Brokers Inc. v. Global Cabinets & Furniture Mfrs., Inc.*, 952 F. Supp. 2d 542, 561-62 (S.D.N.Y. 2013))].  However, Plaintiff asserts that this general right of closely related parties does not apply for two reasons: (i) the Agreement expressly prohibits RBSSI and other third parties from invoking it and (ii) RBSSI was not a "foreseeable" beneficiary of the Agreement.  Neither of these arguments succeeds.

First, and unaddressed by Plaintiff, is the application of the doctrine of estoppel as applied to pleading.  While more commonly arising in the arbitration provision context, the doctrine is equally applicable to forum selection clauses, in part, because "an arbitration clause is merely one species of forum selection clause" and, "[l]ike arbitration clauses, forum selection clauses enjoy a strong presumption in favor of enforcement."  *LaRoss Partners, LLC v. Contact 911 Inc.*, 874 F. Supp. 2d 147, 156 (E.D.N.Y. 2012) (applying theory of direct benefits estoppel in forum selection context) (quoting *Roby v. Corp. of Lloyds*, 996 F.2d 1353, 1363, n. 2 (2d Cir. 1993)).  Under this doctrine, a plaintiff may not

intentionally avoid an arbitration provision by intentionally naming defendants who were not signatories to the agreement while omitting those who were.  *See, e.g., Vertucci v. Orvis*, No. 3:05-cv-1307 (PCD), 2006 WL 1688078, at *5 (D. Conn. May 30, 2006) (staying litigation in favor of arbitration where plaintiff sued individual nonsignatory defendants rather than their employer who was a signatory to agreement and stating that "if a party 'can avoid the practical consequence of an agreement to arbitrate by naming nonsignatory parties as [defendants] in his complaint, or signatory parties in their individual capacities only, the effect of the rule requiring arbitration would, in effect, be nullified") (quoting *Arnold v. Arnold Corp.*, 920 F.2d 1269, 1282 (6th Cir. 1990)).  At least one court has directly applied this doctrine in the forum selection clause context, while others have alluded to it.  *See Midamines SPRL Ltd. v. KBC Bank NV*, No. 12 Civ. 8089 (RJS), 2014 WL 1116875, at *6 (S.D.N.Y. Mar. 8, 2014), *aff'd* 601 F. App'x 43 (2d Cir. 2015) (enforcing forum selection clause where complaint "all but concede[d]" that an assignment was made "precisely to avoid the forum-selection clause" because "of the Second Circuit's instruction that parties should not be permitted to use 'evasive, formalistic means lacking economic substance to escape contractual obligations'") (quoting *Aguas*, 585 F.3d at 701); *see also Citi Structure Construction v. Zurich Am. Ins. Co.*, No. 14-cv-5371 (RA), 2015 WL 4934414, at *3 (S.D.N.Y. Aug. 18, 2015) (finding nonsignatory surety could enforce forum selection clause and stating, that plaintiff "elected to sue only [nonsignatory defendant] does not permit [plaintiff] to escape its contractual obligation").

To determine the applicability of this doctrine, courts look to the allegations in the operative complaint, to assess the closeness of the parties' relationship. *See Smith/Enron Cogeneration Ltd. Partnership, Inc. v. Smith Cogeneration Int'l, Inc.*, 198 F.3d 88, 98 (2d Cir. 1999) (holding that party attempting to resist arbitration was estopped from doing so because it had treated arguably nonsignatory companies and their signatory assignees "as a single unit" in its complaint in a related lawsuit); *Vertucci*, 2006 WL 1688078, at *5 (noting complaint "completely intertwines his claims against all of the defendants" and thus the plaintiff could not "now claim that the defendants have an insufficient relationship with [the signatory] or with one another"); *Carroll v. Leboeuf, Lamb, Greene & MacRae, LLP*, 374 F. Supp. 2d 375, 378 (S.D.N.Y. 2005) (holding that because "the amended complaint lumps [defendants] together . . . and treats them throughout as a unit . . . plaintiffs' attempt to avoid arbitration by pointing to their distinctiveness is unpersuasive").

Here, the allegations clearly indicate that nonsignatory RBSSI acted in concert with signatory RBS, and each of the claims concerns conduct attributable, at least in part, to RBS. Counts I, II, and IV of the Complaint sound in conversion, civil theft, and replevin, and are all based on Plaintiff's loss of possession of its Star Bulk shares. *See* [Dkt. #1, Compl. at ¶¶ 29 (conversion claim based on allegation that plaintiff was "wrongfully and without lawful authority deprived [] of possession of the property"); 34 (civil theft claim based on Defendant RBSSI's "refus[al] to unilaterally return full possession and custody of the Star Bulk shares to F5" and its efforts to "wrongfully continue[] to exercise

dominion over F5's assets"); 41-42 (replevin claim based on wrongful detention of property to which "Plaintiff has immediate right of possession")].  While Plaintiff names Defendants RBSSI and DTC, it omits RBS from these claims, despite also alleging that "RBS and RBSSI have held the Star Bulk shares hostage in an attempt to extract unwarranted legal concessions from F5," "requests by F5 that RBS release the Star Bulk shares largely have been met with obstruction," "RBS repeatedly refused any transfer by demanding in return an additional and much broader release from F5 than was provided for in the 2010 RBS litigation," and that "RBS through its subsidiary Defendant RBSSI still exercises possessory ownership rights over F5's Star Bulk shares, depriving F5 [of] its right of possession and custody over its assets."  [*Id.* at ¶¶ 21-22, 27].

Similarly, Count V of the Complaint is a claim for an accounting, "for any interest, dividends, commissions, remunerations, or benefits that RBSSI directly or indirectly has realized or may realize as a result of or in connection with their possession or control of the shares."  [Dkt. #1, Compl. at ¶ 46].  Once again, signatory RBS is not named, despite Plaintiff's allegations that it "repeatedly [] asked RBS for assurances concerning the precise accounting used by RBSSI to value the Star Bulk shares, calculate interest due F5, and determine the dividend payments due to F5,"and that there are "unresolved liabilities related to RBS's handling of F5's . . . accounts and assets . . . ."  [*Id.* at ¶¶ 20, 24].

Given the coordinated conduct between RBSSI and RBS, that RBSSI is a wholly-owned subsidiary of RBS, and that it was RBS who gave the securities at

issue to RBSSI to manage,[7] the conclusion that Plaintiff intentionally omitted RBS as a defendant in this case "precisely to avoid the forum-selection clause" is inescapable, and thus, "[t]he Court declines to give effect to this purely evasive maneuver." *Midamines*, 2014 WL 1116875, at *6.

Neither Plaintiff's foreseeability nor its contract-based arguments are sufficient to alter this conclusion.  As to foreseeability, Plaintiff asserts that "RBSSI was *not* disclosed to F5, F5 was *not* told that RBSSI would hold the Star Bulk shares in its account or have any role in holding the shares, and F5 has not alleged that RBS and RBSSI acted jointly to commit the wrong complained of in this action."  [Dkt. #50, Pl.'s Opp. at 9].  In short, Plaintiff contends that it did not have actual knowledge of RBSSI and its role at the time it entered into the Agreement.  However, this says nothing about whether RBSSI's role was foreseeable to F5 at the time the Agreement was signed.

When a nonsignatory seeks to invoke a forum selection clause, "the relationship between the non-signatory and [another signatory] must be sufficiently close that the non-signatory's enforcement of the forum selection clause is 'foreseeable' to the signatory against whom the non-signatory wishes to enforce the forum selection clause."  *Magi XXI*, 714 F.3d at 723.  RBSSI is a wholly-owned subsidiary of RBS and part of a wholly-owned holding group, RBS Holdings.  [Dkt. #1, Compl. at ¶ 3].  In addition, the clause in the Agreement concerning RBS's obligation to return the 3 million shares of Star Bulk stock to Plaintiff states that RBS agreed to "take such steps as may be required to release

---

[7] This act alone would appear to make RBS a proper defendant in Count III of the Complaint, which brings a negligence claim arising out of RBSSI's "holding or exercising control over the Star Bulk shares."  *See* [Dkt. #1 Compl. at ¶ 37].

and discharge . . . the security held by [RBS] . . . ."  [Dkt. #26-2, Ex. A to Berry Decl. at ¶ 1.7(b)].  Thus, at the time the Agreement was signed, Plaintiff was aware that RBS could not simply return the securities it received.  It would instead have to take necessary steps to have them released and discharged.  This implies that RBS would need to involve others in obtaining and transferring the securities to F5, which is precisely the role Plaintiffs now (correctly) attribute to the named Defendants in this action.  *See* [Dkt. #1, Compl. at ¶¶ 11-12, 17 (stating that prior to the Agreement RBS sent the share certificate to RBSSI, who in turn arranged for the conversion of the shares, and DTC became their registered holder and placed them in account for RBSSI where they presently sit)].

Plaintiff also repeatedly raises paragraph 10 of the Agreement, which states: "No person other than the Parties may enforce any rights arising out of or under this Agreement *by virtue of* the Contracts (Rights of Third Parties) Act 1999."  [Dkt. #26-2 Ex. A to Berry Decl. at ¶ 10 (emphasis added)].  Nowhere does Defendant RBSSI base its right to assert the forum selection clause on this provision of English law.  It instead grounds its right in the well-established federal common law doctrine allowing "closely related" entities to assert such rights against other signatories.  *See* [Dkt. #26-1, Def.'s Memo. in Supp. of Mot. to Dismiss, at 14].  Contrary to Plaintiff's contention, the clause does not preclude non-parties, on any and all legal grounds, from asserting a right arising out of the Agreement.  *See* [Dkt. #54, Pl.'s Sur-Reply at 1-4].  It simply forecloses one particular legal basis upon which to assert such a right.

**12**

Finally, while Plaintiff vigorously argues in support of its naming RBSSI in this action, notably absent from its filings is any explanation as to why it chose *not* to name RBS as a co-defendant, given the laundry list of misconduct alleged in its Complaint.  *See* [Dkt. #50, Pl.'s Opp. at 15-16].  Accordingly, the Court finds that RBSSI may assert the forum selection clause in this action despite its status as a nonsignatory to the Agreement.

      2.    <u>The Claims Brought in the Complaint "Relate to" the Agreement</u>

Plaintiff next asserts that its "claims in this case are wholly and completely separate from, and unrelated to, the Settlement Agreement."  [Dkt. #50, Pl.'s Opp. at 12-13].

"The scope of [a] forum selection clause is a contractual question that requires the courts to construe the clause and, where ambiguous, to consider the intent of the parties."  *Kasper*, 952 F. Supp. 2d at 563 (quoting *New Moon Shipping Co., Ltd. v. MAN B&W Diesel AG*, 121 F.3d 24, 33 (2d Cir. 1997)).  Thus, the court must "examine the substance of [the] claims, shorn of their labels and compare how they relate to the language of the given forum-selection clause."  *Id.* (quoting *Phillips*, 494 F.3d at 388).

Plaintiff first contends that the claims here are distinct because the "Settlement Agreement resolved a lawsuit brought by TMT and other [Su Entities] against RBS" while the claims here arise "out of Defendant RBSSI's failure to account for any interest or dividends on the Star Bulk shares that accrued during the time period when RBSSI held Plaintiff's shares in Star Bulk." [*Id.* at 13-14]. Essentially, Plaintiff contends that in order for claims to "relate to" the

**13**

Agreement, they must relate to the claims in the underlying litigation which produced it.  As a matter of logic and law, Plaintiff is incorrect.  The question is only whether the claims are "'connected to,' [or] 'associated with,'" the Agreement.  *In re Optimal U.S. Litig*, 813 F. Supp. 2d 351, 367 (S.D.N.Y. 2011) (citations and quotations omitted).

Here, the allegations of fact in the Complaint are littered with references to and events directly arising out of the Agreement.  See [Dkt. #1, Compl. at ¶¶ 13 (quoting and describing RBS's duty under the Agreement); 19 (alleging that "despite repeated requests . . . that RBSSI transfer all rights for control and disposition of the Star Bulk shares to F5 Capital, RBSSI has wrongfully failed to do so"); 20 (raising accounting concerns based on "the multiple years that [RBSSI] has enjoyed possession of F5's Star Bulk shares"); 22 (stating that Plaintiff has "had an unencumbered legal right since at least May 2012 [the month and year the Agreement was signed]" to the shares); 25 (challenging RBSSI's pre-Agreement conversion of the paper shares RBSSI received as pledged assets, which were the subject of the Agreement, into electronic form)].

Next, Plaintiff asserts that because of events transpiring after the Agreement, including a "15:1 reverse stock split," the number of Star Bulk shares in RBSSI's possession is greater than the number contemplated by the Agreement, and thus, its claims here concern those additional shares as well as those subject to the Agreement.  *See* [Dkt. #50, Pl.'s Opp. at 14].  Plaintiff's argument again fails, not least, because it is not seeking to recover just those shares (or the monetary value thereof) RBSSI obtained after the Agreement, but

14

instead seeks recovery on the basis of *all* of the shares in RBSSI's possession, including those which are indisputably contemplated by the Agreement.  *See, e.g.*, [Dkt. #1, Compl. at ¶¶ 14-17, 23].

Moreover, while Plaintiff brings claims against RBSSI and DTC for the return (or market value) of the Star Bulk shares in their possession or control, Plaintiff relies solely on the Agreement to establish its right to the shares, the duty of the Defendants to exercise care over them, and the wrongful nature of the Defendants' conduct.  *See* [Dkt. #1, Compl. at ¶¶ 13, 18-19, 22-23].[8]  This fact alone weighs heavily in favor of permitting RBSSI to enforce the forum selection clause.  *See QSR*, 2015 WL 4393576, at *7 ("If a third party's liability in a lawsuit depends on the application of the terms of a contract with a forum selection clause . . . that party may enforce the forum selection clause of the contract.").

B.     Enforcement of the Forum Selection Clause Would Not Be Unjust

A valid forum selection clause will be enforced unless "(1) its incorporation was the result of fraud or overreaching; (2) the law to be applied in the selected forum is fundamentally unfair; (3) enforcement contravenes a strong public policy of the forum in which suit is brought; or (4) trial in the selected forum will be so difficult and inconvenient that the plaintiff will effectively be deprived of his day in court."  *Martinez*, 740 F.3d at 227.  In making a showing under any of these

---

[8] The only other possible basis the Court can find in the Complaint would be the Forward Freight Agreement, which appears to have governed the trading account that spawned the original litigation with RBS.  *See* [Dkt. #1 Compl. at ¶ 9].  However, Plaintiff makes no such argument, and there are no allegations regarding the terms of the agreement, nor does the Complaint identify the parties to it.  [*Id.*].

circumstances, Plaintiff bears a "heavy burden."  *Id.* at 219.  Plaintiff offers two arguments under the fourth circumstance, neither of which is sufficient.

First, Plaintiff asserts that "all of the witnesses, key documents, and other evidence and facts relevant to Plaintiff's claims are located in this district."  [Dkt. #50, Pl.'s Opp. at 18].  Courts routinely reject arguments of litigation burden where the plaintiff has not shown that the burden would "prevent him from bringing suit" in the chosen forum.  *Phillips*, 494 F.3d at 393 (rejecting plaintiff's contention that litigation in England would be difficult because none of his witnesses were located there and stating that such argument merely establishes that "litigation in England may be more costly or difficult, but not that it is impossible."); *Arial Techs.*, 2015 WL 1501115, at *5 (rejecting plaintiff's argument that "it would be difficult to summon  . . . witnesses to a French court" and enforcing forum selection clause because plaintiff "failed to show that litigation in France would be impossible or that [plaintiff] would incur any hardships that were not foreseeable") (citations and quotations omitted).[9]

Second, Plaintiff contends that enforcement would be unjust because "the courts of England have no [personal] jurisdiction over RBSSI, and certainly no jurisdiction over DTC."  [Dkt. #50, Pl.'s Opp. at 19].  However, personal jurisdiction is waivable, and absent any showing that RBSSI or DTC would not

---

[9] **Plaintiff's citations to *Frederiksson v. HR Textron, Inc.*, 484 F. App'x 610 (2d Cir. 2012) and *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146 (2d Cir. 2005) and application of the three-factor test courts consider in determining whether to honor a plaintiff's choice of forum is unpersuasive, because the defendant here, unlike those in *Frederiksson* and *Norex*, is seeking to enforce a valid forum selection clause.**

waive this personal defense, Plaintiff has not established that litigation in England would be impossible. *See* Fed. R. Civ. P. 12(h)(1).

IV.    <u>Conclusion</u>

For the foregoing reasons, Defendant RBSSI's motion to dismiss is GRANTED.  The Clerk is directed to close this file.

IT IS SO ORDERED, ADJUDGED AND DECREED, this 30th day of September 2015, Hartford, Connecticut

_____/s/_____
Vanessa L. Bryant,
United States District Judge

17